STATE OF NORTH CAROLINA v. LAWRENCE LEE HEFLER

No. 138PA83

(Filed 10 January 1984)

1. **Automobiles and Other Vehicles § 113.1— involuntary manslaughter—sufficiency of evidence**

    The evidence was sufficient to be submitted to the jury on the charge of involuntary manslaughter where the evidence tended to show that defendant was driving after drinking and taking drugs; that he had a thoughtless disregard of the consequences of his acts and indifference to others; that defendant did not stop after hitting a parked automobile; that defendant fled the scene after striking a pedestrian and after striking another automobile; that defendant crossed to the left side of the roadway to strike the pedestrian, who was on his proper side of the road as a pedestrian; that defendant was going 30-35 miles per hour on a roadway in an apartment area where "speed bumps" were located and did not reduce his speed to avoid colliding with either the pedestrian or the second automobile.

2. **Homicide § 6.1— "year and a day" rule—not applied to involuntary manslaughter cases**

    The "year and a day" rule does not apply to involuntary manslaughter cases since, in balancing the interest of the defendant against those of the State, society's interest in the prosecution of persons charged with involuntary manslaughter outweigh the hardship imposed upon a defendant in not being charged for a crime. North Carolina does not have a statute of limitations for the prosecution of involuntary manslaughter, a felony.

ON discretionary review of the decision of the Court of Appeals, 60 N.C. App. 466, 299 S.E. 2d 456 (1983), finding no error in the judgment entered by *Snepp, J.*, at the 21 September 1981 Criminal Session of MECKLENBURG Superior Court. Heard in the Supreme Court 4 October 1983.

Defendant was tried on the charge of involuntary manslaughter upon the following bill of indictment:

THE JURORS FOR THE STATE UPON THEIR OATH PRESENT, That Lawrence Lee Hefler, late of the County of Mecklen-

burg on the 18th day of January, 1980, with force and arms, at and in the County aforesaid, did, unlawfully, wilfully and feloniously kill and slay one James Edward Stevens contrary to the statute in such case made and provided and against the peace and dignity of the State.

Defendant waived arraignment and entered a plea of not guilty.

The evidence, in summary, showed: On the evening of 18 January 1980, defendant and the witness Herbert Gerald Horton, Jr. were at Horton's apartment in the city of Charlotte drinking beer and taking quaaludes. Defendant admitted that he consumed three or four beers and smoked two "joints" of marijuana. They drove to Sun Valley Apartments, where they visited a friend for about half an hour. When they left the apartment, defendant drove his Chevrolet automobile, and as he backed out, he struck a parked Volkswagen car and barely missed a large trash dumpster. He left the scene of this collision, driving out of the apartment area toward Arrowood Road at a speed of 30 to 35 m.p.h. On the roadway leading to Arrowood Road, there were two "speed bumps" which were not painted. The area was lighted by street lights.

James Stevens was jogging on the left side of the roadway, facing oncoming traffic. He was wearing dark shorts, a light-colored jersey, and large fluorescent gloves. James Sledge was driving into the apartment area on the road. He saw the jogger about one hundred yards away, approaching his car. Sledge then saw defendant's car swerve to its left behind Stevens and strike him from the rear. Defendant's car knocked Stevens to his left, and then it collided with Sledge's automobile. Defendant said he was going "to blow this place" and ran from the scene of the collision. He was arrested three days later.

Stevens was given emergency treatment at the scene and taken to the hospital. He was unconscious and never regained consciousness before he was declared dead fourteen months later, on 16 March 1981. The collision caused a subdural hematoma with damage to Stevens's brain. Dr. Brawley, a neurosurgeon, testified that Stevens died from the swelling of the brain caused by being struck by defendant's car. Stevens's brain was forced into his spinal column by the intracranial pressure resulting from the contusion of the brain. A craniotomy was performed, and Stevens's

brain was observed to be "peppered with hematoma." Dr. Braw-
ley testified that in fast-developing cases of intracranial injury
and hemorrhage, it may be impossible to save the patient if
surgery is delayed for more than an hour after the injury. Dr.
Woods, the medical examiner, testified that the immediate cause
of death was broncho-pneumonia as a complication of the severe
head injury.

The case was submitted to the jury with possible verdicts of
involuntary manslaughter, death by vehicle, or not guilty. The
jury found defendant guilty of involuntary manslaughter. From
judgment of imprisonment, defendant appealed to the Court of
Appeals, and this Court granted discretionary review.

*Rufus L. Edmisten, Attorney General, by Fred R. Gamin,
Assistant Attorney General, for the state.*

*Eben T. Rawls, for defendant appellant.*

MARTIN, Justice.

Defendant brings one issue for our consideration. He argues
that the trial court should have dismissed the case at the close of
the state's evidence. The defendant did not present evidence. De-
fendant bases his assignment upon two contentions.

[1] First, defendant contends that there was insufficient evi-
dence to submit the case to the jury on the charge of involuntary
manslaughter.

> Involuntary manslaughter is the unlawful killing of a human
> being unintentionally and without malice but proximately
> resulting from the commission of an unlawful act not amount-
> ing to a felony, or some act done in an unlawful or culpably
> negligent manner . . . and where fatal consequences of the
> negligent act were not improbable under all the facts exist-
> ent at the time. . . . "Culpable negligence under the criminal
> law is such recklessness or carelessness, resulting in injury
> or death, as imports a thoughtless disregard of consequences
> or a heedless indifference to the safety and rights of others."

*State v. Williams,* 231 N.C. 214, 215-16, 56 S.E. 2d 574, 574-75
(1949) (citations omitted). The trial court charged the jury on four
unlawful acts: driving without due caution and circumspection and

at a speed or in a manner as to be likely to endanger any person, N.C.G.S. 20-140(b); driving at a speed greater than is reasonable and prudent under the conditions then existing, N.C.G.S. 20-141(a); failing to decrease speed to avoid colliding with any person, N.C.G.S. 20-141(m); and failing to drive on the right side of the highway, N.C.G.S. 20-146. The court further instructed the jury that there was no evidence that defendant intentionally violated any of these safety statutes but the jury could find culpable negligence in the unintentional violation of a statute accompanied by recklessness of probable consequences of a dangerous nature, when tested by the rule of reasonable foresight, amounting altogether to a thoughtless disregard of the consequences or a heedless indifference to the safety of others.

When the evidence is considered in the light most favorable to the state, as we must do, *State v. Witherspoon*, 293 N.C. 321, 237 S.E. 2d 822 (1977), it was sufficient to deny defendant's motion to dismiss. There is ample evidence to support findings that defendant was driving after drinking and taking drugs and that he had a thoughtless disregard of the consequences of his acts and indifference to others. He did not stop after hitting the parked Volkswagen and fled the scene after striking Sledge's car. He crossed to the left side of the roadway to strike Stevens, who was on his proper side of the road as a pedestrian. He was doing 30 to 35 m.p.h. on a roadway in an apartment area where "speed bumps" were located and did not reduce his speed to avoid colliding with Stevens or Sledge. He did not drive with due caution and circumspection and as a result killed Stevens. Defendant's argument is without merit.

[2] Defendant's contention that the "year and a day" rule should be applied to the charge of involuntary manslaughter is more intriguing. A brief review of the history of the rule is helpful. The ancient statute, upon which the rule is based, reads in pertinent part:

An Appeal of Murther. . . . (4) It is provided also, that no Appeal shall be abated so soon as they have been heretofore; but if the Appellor declare the Deed, the Year, the Day, the Hour, the Time of the King, and the Town where the Deed was done, the Appeal shall stand in Effect, (5) and shall

not be abated for Default of fresh Suit, if the Party shall sue within the Year and the Day after the Deed done.

Statutes of Gloucester, 6 Edw. I, c. IX (1278); 1 Statutes at Large 67 (1763). The "Appeal" referred to in the statute was not from a trial court to an appellate court. Rather, an "appeal of death" was one of the remedies at common law for murder. It was a criminal prosecution by a private person against another for this heinous crime demanding punishment on account of the injury suffered, rather than for the offense against the public. Originally, the appellor could recover damages (a sort of criminal wrongful death proceeding) but the proceeding later evolved into the infliction of punishment on the wrongdoer. 4 W. Blackstone, Commentaries *313. Appeals of death were abolished in England in 1819.

When adopted, the year and a day rule was a statute of limitations with respect to the commencement of an appeal of death action. *Id.* at *315. Through transition, and perhaps misinterpretation, the rule as we know it today came to be applied to murder cases. *See generally* Note, *The Abolition of the Year and a Day Rule: Commonwealth v. Ladd,* 65 Dick. L. Rev. 166 (1961). Such was the state of the law when this Court wrote in *State v. Orrell,* 12 N.C. 139, 141 (1826): "[I]f death did not take place within a year and a day of the time of receiving the wound, the law draws the conclusion that it was not the cause of death; and neither the court nor jury can draw a contrary one." In the same case, Chief Justice Taylor wrote: "For if the death happened beyond that time, the law would presume that it proceeded from some other cause than the wound." *Id.* at 141.

This Court has mentioned the rule in six cases: *State v. Orrell, supra; State v. Shepherd,* 30 N.C. 195 (1847); *State v. Baker,* 46 N.C. 267 (1854); *State v. Haney,* 67 N.C. 467 (1872); *State v. Morgan,* 85 N.C. 581 (1881); *State v. Pate,* 121 N.C. 659, 28 S.E. 354 (1897). All six cases are murder cases with sentences of death. In only two of the cases, *Orrell* and *Haney,* was there a challenge based upon the rule. The other four cases involved motions based upon other defects in the indictments or variances in the evidence in which the rule is only incidentally involved and not controlling of the outcome. Only in *Orrell* did the Court hold that the rule required that the judgment be arrested. This Court has never applied the rule to an involuntary manslaughter case. Defendant

State v. Hefler

contends that the rule should be extended to bar prosecutions for involuntary manslaughter. We are not so persuaded and decline the invitation to so extend the rule.

The apparent reason for applying the rule to murder prosecutions was the uncertainty of medical science in determining the cause of death because of the long lapse of time between the injury and death. The reasoning was that in cases where the defendant's life was at stake, the rule of law ought to be certain. 3 Coke, Institutes 53 (1817); *The King v. Dyson*, 2 K.B. 454 (1908).

We take judicial notice of the rapid development and proliferation of the art and science of medicine and crime detection. Sophisticated medical tests, analyses, and diagnoses allow positive evidence to be presented to a jury on questions of causation in criminal prosecutions. For the courts to remain judicially oblivious of these advances when considering whether to extend an ancient common law rule would be folly. We must let the light of scientific development illuminate the legal issues of today. It would be incongruous indeed that medical science has developed to the point that it may prolong human life for long periods if that same development be utilized to bar conviction of a killer by prolonging the life of his victim.

In resolving this dilemma, the question of what constitutes the death of a human being may become pertinent. Although it is not necessary in the resolution of this appeal to apply the definition of death as set out in N.C.G.S. 90-323, such application may be entirely appropriate in cases where the rule is invoked. Even so, the evidence in this case would support a finding that Stevens died, as defined in the statute, well before the expiration of a year and a day following his injury. The statute in relevant part reads: "Brain death, defined as irreversible cessation of total brain function, may be used as a sole basis for the determination that a person has died, particularly when brain death occurs in the presence of artificially maintained respiratory and circulatory functions." Dr. Robert Brawley, an expert medical witness specializing in neurosurgery, was one of the physicians attending Stevens from the time he was admitted to the emergency room until he was declared dead on 16 March 1981. He testified, in part, as follows: When Stevens was first examined, he was comatose, unconscious, responding to pain, and decerebrate on the left

side. He only had reflex movement on his left side; his right side moved in a semi-purposeful manner. A CT scan revealed that there was bruising and a hematoma on the right side of the brain. About thirty-six hours later, his condition deteriorated suddenly. He became totally unresponsive, even to pain, and his right eye dilated, indicating that his brain was herniating, exuding from the skull into the spinal column. A craniotomy was immediately performed on Stevens. There was no significant change in his condition. Although intensive efforts were applied to Stevens for a month, it became apparent that he was not going to make a satisfactory recovery. Two additional neurosurgeons examined Stevens and agreed with this prognosis. After a conference with Stevens's family, it was agreed to cease the intensive efforts, and thereafter he was only fed. His temperature was uncontrollable because the part of his brain that controlled it was destroyed. "It was one of a vegetated state until he died."

This evidence would support a finding that while Stevens was receiving artificially maintained respiratory functions and other intensive treatment and support, his brain irreversibly and totally ceased functioning within the meaning of the statute approximately thirty-six hours after he was admitted to the hospital.

Bearing in mind that we are not faced with the issue of whether the rule should continue to be applied in murder cases, upon which we express no opinion, we do not hesitate to refuse to extend the rule for the first time to involuntary manslaughter cases. *See Commonwealth v. Evaul*, 5 Pa. D. & C. 105 (1924) (the Pennsylvania court refusing to extend the rule to involuntary manslaughter cases). Pennsylvania later abolished the rule entirely. *Commonwealth v. Ladd*, 402 Pa. 164, 166 A. 2d 501 (1960). We recognize there is authority to the contrary. *Elliott v. Mills*, 335 P. 2d 1104 (Okla. Crim. App. 1959) (the Oklahoma court applying the rule while recognizing that it had "run the limit of its logic"). However, we find the better reasoned rule to be consistent with our decision. *See generally* Annot., 60 A.L.R. 3d 1323 (1974). Indeed, as early as 1908, the merit of the rule was doubted in England itself. *The King v. Dyson, supra*, 2 K.B. 454.

We also recognize, but are not convinced by, the argument that not applying the rule may allow the Damocles sword of

prosecution to remain above the head of a defendant for an additional period of time. Such delays, of course, cause problems for the defendant as well as the state. North Carolina does not have a statute of limitations for the prosecution of involuntary manslaughter, a felony. *State v. Johnson,* 275 N.C. 264, 167 S.E. 2d 274 (1969). Our reports contain many cases that were tried years after the crime was committed. *E.g., State v. Wingler,* 184 N.C. 747, 115 S.E. 59 (1922) (murder committed in 1893, trial in 1922). In balancing the interests of the defendant against those of the state in this respect, we find that society's interests in the prosecution of persons charged with involuntary manslaughter outweigh the hardship imposed upon the defendant.

The decision of the Court of Appeals is

Affirmed.