PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ANTHONY H. WARNICK,

        Petitioner - Appellant,

v.

GLYNN BOOHER, Warden,

        Respondent - Appellee.

No. 02-5201

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 01-CV-031-K(C))**

Philip J. Weiser, University of Colorado School of Law, Boulder, Colorado, for the Petitioner - Appellant.

William R. Holmes, Assistant Attorney General (W. A. Drew Edmondson, Attorney General, with him on the brief), Oklahoma City, Oklahoma, for Respondent - Appellee.

Before **SEYMOUR**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and **HARTZ**, Circuit Judge.

**HARTZ**, Circuit Judge.

Anthony Warnick appeals the district court's denial of his application for habeas corpus relief under 28 U.S.C. § 2241.

While serving the second of two consecutive sentences, Mr. Warnick requested a review of his first sentence. He thought that the state had improperly subtracted 155 good-time credits—which, by statute, substitute for one day of imprisonment each. Oklahoma prison authorities initially rejected Mr. Warnick's challenge. But while this case was pending in district court, an Oklahoma Court of Criminal Appeals decision involving another prisoner made clear that the 155-credit subtraction was unlawful. The prison accordingly audited Mr. Warnick's sentence and restored the 155 credits. It did not give Mr. Warnick the full relief he sought, however, because during the audit it discovered an unrelated arithmetical error and subtracted 53 credits.

Mr. Warnick contends that the 155-credit subtraction and the 53-credit offset were unconstitutional on various grounds. His challenges to the 155-credit subtraction are moot because the prison has corrected the error. Accordingly, we vacate the district court's ruling on the 155 credits and remand for the district court to dismiss its judgment on the issue for lack of jurisdiction. That leaves for consideration Mr. Warnick's double-jeopardy challenge to the 53-credit offset. The district court, however, has not addressed this issue. Because the question of the offset's constitutionality should be decided by the district court in the first instance, we remand for further proceedings.

## I. PRELIMINARIES

### A. State Proceedings

On February 24, 1989, an Oklahoma state court sentenced Mr. Warnick to 10 years' imprisonment for lewd molestation. He was eventually released. On March 20, 1996, however, he was convicted on new charges of lewd molestation and sexual abuse of a minor, again in Oklahoma state court. He was sentenced to 20 years' imprisonment for each of these offenses, to be served concurrently. Additionally, his probation was revoked and he was ordered to serve six years' further imprisonment on his 1989 conviction. The six-year term was to be served before the 20-year sentences.

In Oklahoma, as in many other states, an inmate can earn good-time credits that reduce the duration of a sentence at the rate of one day per credit. Okla. Stat. tit. 57, § 138(A). The number of credits that an inmate earns each month is determined by his "class level"—for example, at class-level one, the inmate earns no credits; at level two, 22 credits; at level three, 33 credits; and at level four, 44 credits. *Id.* § 138(B) & (D) An inmate's class level depends on how long he has been confined, his participation in employment or other programs, and his general behavior. *Id.* § 138(D).

On February 1, 1997, Mr. Warnick was assigned to class-level four. He was then participating in the prison's sex-offender treatment program and held a

-3-

job at its furniture factory. On June 1, however, Mr. Warnick was reassigned to class-level three, evidently because of his removal from the treatment program. On July 10, 1997, he was transferred to a different facility, consequently losing his furniture-factory job. On April 1, 1998, Mr. Warnick began as a "Vo-Tech student" and was returned to class-level four. Based on his days of confinement and the credits that he had earned, his "rebill date"—the date on which his first sentence ended and his two concurrent sentences began—was June 28, 1998. That date was duly entered on Mr. Warnick's consolidated time card for the six-year sentence, and a new card was started for his concurrent 20-year sentences.

What happened next is not clear from the record. A July 25, 2000, audit apparently revealed that Mr. Warnick should have been placed in class-level one when he lost his furniture-factory job. Instead, he was allowed to remain at class-level three, thereby earning credits to which he was not entitled. According to the audit memo, his sentence needed to be corrected by removing 75 credits and changing his rebill date from June 28 to August 18, 1998. But in his November 1, 2004, brief on appeal, Mr. Warnick states that the July 25 audit resulted in the removal of 155 credits. And an affidavit by a sentence-administration-unit employee explains that the July audit resulted in the removal of 155 credits and that this adjustment changed Mr. Warnick's rebill date from June 28 to August 18, 1998. Not only does the audit memo disagree with the brief and

affidavit on the number of credits that were removed, but also *neither* figure matches the 52-day difference between June 28 and August 18, 1998, as one would expect, given that each credit substitutes for one day of confinement under § 138(A).

In any event, on July 28, 2000, Mr. Warnick filed a "request to staff"—the first stage in the prison grievance process—asking to be told "how time can be taken from me from a case I have already discharged." R. doc. 1 ex. N. On August 1 he was informed in writing by a prison staff member: "I was told that if days were given and you were not actually eligible to earn them[,] [an auditor] can take the days—even on a discharged case." *Id.* On August 9 he filed a formal grievance; prison officials denied relief again, for the same reason. On August 21 he appealed and on August 23 his appeal was returned on a form with a check mark on a line beside "no grounds for appeal." R. doc. 1 ex. Q.

## B. Federal Court Proceedings

On January 2, 2001, Mr. Warnick filed an application for habeas corpus relief against Warden Glynn Booher under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Oklahoma. He contended that the postponement of his rebill date violated due-process, equal-protection, double-jeopardy, cruel-and-unusual-punishment, and ex post facto principles. The district court had jurisdiction to entertain a request for habeas corpus relief that

would affect the duration of Mr. Warnick's confinement even though his success would not have resulted in his immediate release. *See Wilkinson v. Dotson*, 125 S. Ct. 1242, 1247–48 (2005). On January 8, 2001, the case was transferred to the United States District Court for the Northern District of Oklahoma, the district within which Mr. Warnick had been convicted. On January 30 the district court recharacterized Mr. Warnick's application as one under § 2241 rather than § 2254 and directed that the Warden either respond or move to dismiss. Venue remained proper in the Northern District of Oklahoma notwithstanding the application's recharacterization. *See* 28 U.S.C. § 2241(d).[1]

On March 22 the Warden moved to dismiss for failure to exhaust state remedies. He claimed that Mr. Warnick could seek mandamus in Oklahoma state court. Mr. Warnick opposed the motion to dismiss. He also noted that a further audit had taken place on February 12, resulting in the revocation of an additional

---

[1] Section 2241(d) provides:

Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application. The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

968 credits from the concurrent 20-year sentences for failure to participate in the sex-offender treatment program. On February 26, 2002, the district court denied the Warden's motion to dismiss, agreeing with Mr. Warnick that no state-court remedy was available.

In May 2002, as a result of an Oklahoma Court of Criminal Appeals decision holding that mandatory participation in the sex-offender treatment program is unconstitutional, the prison again audited Mr. Warnick's sentence and returned the 155 credits originally subtracted and the 968 that were subtracted on February 12. But the same audit revealed an unrelated 53-credit calculation error: in April 1996, instead of subtracting 53 credits, prison staff subtracted 106 credits from Mr. Warnick's sentence. The prison corrected this error as well, resulting in a net adjustment of 968 credits on the 20-year sentences and 155 offset by 53, or 102, credits on the six-year sentence. Mr. Warnick's rebill date became July 15, 1998, again by calculations that we do not understand and that do not seem to follow the one-credit-equals-one-day rule. (Indeed, the Warden refers to the 53 credits in one brief as "the 53 day correction," Aplee. Br. (April 9, 2004) at 5, and in another as "the 17 days of earned credits," Aplee. Br. (December 3, 2004) at 2-3.) As a result of this audit, the only credit subtraction currently in dispute is the 53-day calculation-error offset.

On November 15, 2002, the district court denied Mr. Warnick's application for habeas corpus relief. But it addressed only the original 155-day subtraction, not the later 53-day offset. (Apparently, neither party had advised the court of the most recent adjustments.) The court held that there was no factual or legal basis for his equal-protection claim, the offset did not violate double-jeopardy principles because it did not result in confinement beyond the original sentence, there was no merit to his claim that "undue mental anguish and stress" resulting from the correction constituted cruel and unusual punishment, any change in the prison regulations did not disadvantage Mr. Warnick in violation of ex post facto principles, and the Due Process Clause did not entitle him to any procedural protection with respect to the subtraction of erroneously awarded credits because his interest in such credits was not a liberty interest.

On November 21, 2002, Mr. Warnick filed a notice of appeal to our court.

## C. Certificate of Appealability

"Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." 28 U.S.C. § 2253(c)(1)(A). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2). "Where a district court has

rejected the constitutional claims on the merits," the prisoner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Mr. Warnick originally challenged on appeal the subtraction of the 155 credits on double-jeopardy, due-process, and ex post facto grounds. On June 3, 2003, we granted a certificate of appealability covering one of Mr. Warnick's due-process contentions, and on March 9, 2004, we expanded it to cover his contention that subtraction of good-time credits after his rebill date violated double-jeopardy principles. In response to the Warden's contention that these claims were mooted by restoration of the 155 credits, Mr. Warnick has now further contended that the 53-credit offset in May 2002 was likewise contrary to double-jeopardy principles because it took place after his rebill date had passed.

In our March 2004 order we expressly reserved the question whether the restoration of the 155 credits moots Mr. Warnick's claims. We now hold that it does in part. The Warden has conceded the error of the original 155-credit reduction, so there is nothing left for judicial resolution on that matter. Accordingly, the district court's ruling has been mooted insofar as it concerns the original reduction. But Mr. Warnick's claim as a whole is not mooted, because the 155 credits have not been fully restored as he sought. With respect to the

unrestored 53 credits, the Warden has in essence simply changed his explanation for why Mr. Warnick is not entitled to them, and that new explanation is still subject to Mr. Warnick's original objection that the subtraction of any credits after his rebill date violates double-jeopardy principles. Mr. Warnick therefore need not pursue a new § 2241 application to challenge the failure to restore the remaining 53 credits. His claim has remained the same; it is only the response to the claim that has changed. Indeed, our grant of a certificate of appealability on his double-jeopardy claim probably need not be supplemented to encompass his challenge to the 53-credit adjustment. To the extent that it does not encompass this challenge, we grant an additional certificate on the issue.

## II.    DISCUSSION

Mr. Warnick's sole surviving claim is that the 53-credit offset on his six-year sentence violated double-jeopardy principles because it took place after he had fully served that sentence. We remand to the district court so that it can address the merits of that claim. But in light of the district court's abbreviated treatment of the issue in its prior decision, we believe a further discussion of the applicable law will be helpful. The district court denied Mr. Warnick's double-jeopardy claim on the ground that the reduction in good-time credits had not resulted in confinement beyond his original six-year sentence. But, as we shall see, the *timing* of adjustments to a defendant's term of confinement has double-

jeopardy implications. Even a correction to a clear error may be unconstitutional if the correction comes at a time that violates the defendant's legitimate expectation of finality. Whether Mr. Warnick suffered a double-jeopardy violation raises interesting questions of federal constitutional law, but it also raises questions regarding Oklahoma law, administrative procedures within the Oklahoma Corrections system, and the specific facts of this case. These matters are best addressed by the district court in the first instance. The following describes, in a limited manner, considerations that should guide the district court in determining whether the record must be supplemented and how ultimately to resolve the double-jeopardy claim.

The Double Jeopardy Clause of the Fifth Amendment provides: "No person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb." In *Benton v. Maryland*, 395 U.S. 784, 794 (1969), the Supreme Court held that the Fourteenth Amendment makes applicable to the states all the protections provided by the Double Jeopardy Clause.

The Clause protects against (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *Jones v. Thomas*, 491 U.S. 376, 381 (1989) (internal quotation marks omitted). The prohibition against multiple punishments, which is the prohibition at issue in this case, itself includes

two prohibitions: (1) against "greater punishment than the legislature intended," *Jones*, 491 U.S. at 381 (internal quotation marks omitted); and (2) against sentence adjustments that upset a defendant's legitimate "expectation of finality in his sentence." *United States v. DiFrancesco*, 449 U.S. 117, 136 (1980). The district court apparently focused on the first of these multiple-punishment prohibitions, denying Mr. Warnick's double-jeopardy claim on the ground that the offset of which he complains did not result in confinement beyond the original sentence.

To be sure, Mr. Warnick's punishment does not exceed what the legislature authorized, as was the case in *Ex Parte Lange*, 85 U.S. 163 (1873) (imposition of two alternative, and mutually exclusive, punishments—fine and imprisonment); *accord In re Bradley*, 318 U.S. 50, 52 (1943), and *Jones* (defendant sentenced, contrary to state law, to both felony murder and the underlying felony). But protection of the "expectation of finality" recognized in *DiFrancesco*, 449 U.S. at 136, imposes limits on sentence adjustments, even to comply with the sentencing statute. In that case the issue was whether a federal statute permitting the government to appeal the sentence of a "dangerous special offender" violated the Double Jeopardy Clause. *DiFrancesco*, 449 U.S. at 118–21. It was clear that the government was seeking only a punishment authorized by statute; indeed, it was arguing that the sentence imposed was unlawful. *Lange* and *Jones* were thus

inapplicable; there was no question of imposing a punishment more severe than the legislature had intended. Instead, the question was what limits the Clause imposes on an adjustment to a sentence that moves it *within* the range authorized by the legislature.

The Court identified one necessary condition for a violation of the Clause on this ground—namely, that the adjustment violate a legitimate expectation of the defendant in the finality of his sentence. *Id.* at 137–39. Acquittal, as a matter of constitutional law, gives a defendant a legitimate expectation in the finality of his (lack of a) sentence. *Id.* at 129–130, 132. But the Court observed that "the pronouncement of sentence has never carried the finality that attaches to an acquittal," *id.* at 133, and held that "[t]he Double Jeopardy Clause does not provide [a] defendant with the right to know at any specific moment in time what the exact limit of his punishment will turn out to be," *id.* at 137. Nonetheless, although constitutional law did not create a legitimate expectation of finality, one might have been created by *non*constitutional law. In *DiFrancesco*, however, this was clearly not the case because the adjustment was authorized by the statutory appeal provision at issue. *Id.* at 137, 139. Because neither constitutional nor nonconstitutional law gave the defendant a legitimate expectation that his sentence was final when pronounced and could not be corrected on appeal, the government appeal did not violate the Double Jeopardy Clause.

-13-

In this case it is undisputed that Mr. Warnick's sentence, even after the 53-day offset, is not greater than the legislature intended. Thus, his claim is similar to that in *DiFrancesco*. Although in form his sentence has not been increased, one may question whether there is a substantial difference with respect to the interest in finality between requiring a person to serve additional time on a discharged sentence because of an alleged error in imposing sentence or because of an alleged error in measuring its execution. *Cf. DiFrancesco*, 449 U.S. at 137 (comparing increase of sentence on appeal to revocation of probation (which involves no increase in sentence) and finding the situations "different in no critical respect"). In determining whether Mr. Warnick had a legitimate expectation that his sentence was final before the 53-day offset was made, it will be necessary for the district court to examine two issues: (1) whether Oklahoma law—constitution, statutes, regulations, and case law—forbids making the offset after Mr. Warnick's rebill date and (2) if not, whether there has been an event in this case, like an acquittal, that gave Mr. Warnick a legitimate expectation of finality as a matter of federal constitutional law, state law to the contrary notwithstanding.

As for the second of these issues, we note that the federal constitution apparently creates only modest legitimate expectations (aside from the expectation of finality in an acquittal). *DiFrancesco* establishes that the

-14-

pronouncement of sentence in itself does not give a prisoner a legitimate expectation of finality; if it did, then the sentencing appeal that *DiFrancesco* approved would have violated double-jeopardy principles. Indeed, this court suggested years ago that errors in measuring the execution of a sentence could be corrected at any time. In a case in which a prisoner was freed several years early because of an error in the prison records, we pronounced the dictum that there could be "no doubt of the power of the government to recommit a prisoner who is released or discharged by mistake, where his sentence would not have expired if he had remained in confinement." *White v. Pearlman*, 42 F.2d 788, 789 (10th Cir. 1930). If the government can recommit even a prisoner whom it freed, then surely it can recommit one that remains in prison—particularly when it is realized that to "recommit" in the latter case is simply to reclassify certain days of imprisonment as belonging to one consecutive sentence rather than another. On the other hand, the Fourth Circuit has held that it violated the Double Jeopardy Clause to increase sentences that had already been served even though they had been served concurrently with a sentence on which the prisoner was still confined. *See United States v. Silvers*, 90 F.3d 95, 101–02 (4th Cir. 1996). We leave it to the district court in the first instance to resolve the issue.

## III.  CONCLUSION

To the extent that the district court rendered judgment on Mr. Warnick's claim that the 155-credit subtraction from his good time was incorrect, we vacate the judgment and remand to the district court to dismiss the claim as moot.  As for Mr. Warnick's claim that Oklahoma violated double-jeopardy principles by making the 53-credit offset, we remand to the district court for further proceedings.  On remand the district court may wish to appoint counsel for Mr. Warnick.

No. 02-5201, *Warnick v. Booher*

**HARTZ**, Circuit Judge, concurs:

I add this concurrence simply to note the difficulty of determining whether Oklahoma law gave Mr. Warnick a legitimate expectation that his sentence could not be adjusted upward after his rebill date.

Mr. Warnick was sentenced to two terms of imprisonment. The first term arose from a single sentence, the second term arose from two concurrent sentences. After telling Mr. Warnick that his first term was complete and while Mr. Warnick was serving his second term, the prison discovered that the first term was in fact supposed to continue for a further 53 days and adjusted Mr. Warnick's records accordingly. At the outset it should be noted that this precise context would not arise for a federal prisoner. Federal statutes have provided that consecutive sentences are to be treated for sentence-administration purposes as a single sentence. *See* 18 U.S.C. § 3584(c); 18 U.S.C. §§ 4161, 4165 (repealed 1984). These statutes have never been held unconstitutional.

In Oklahoma, however, consecutive sentences are treated separately. *See* Okla. Stat. tit. 21, § 61.1.[1] In *Ex parte Grimes*, 221 P.2d 679, 681 (Okla. Crim.

---

[1] Okla. Stat. tit. 21, § 61.1 states:

When any person is convicted of two (2) or more crimes in the same proceeding or court or in different proceedings or courts, and the judgment and sentence for each conviction arrives at a state penal institution on different dates, the sentence which is first received at

(continued...)

App. 1950), the court wrote: "Where there are one or more convictions and judgments thereon, the accused should be incarcerated upon the first conviction for which a commitment is issued for the period of time therein named. At the end of that period of confinement, the imprisonment should commence upon the second conviction and terminate in like manner, and so on for the third and subsequent convictions." (internal quotation marks omitted). The question before the district court is whether in this context an Oklahoma prisoner has such an expectation of finality with respect to a sentence that a correction to the period of confinement cannot be made after the sentence has been discharged but while the prisoner is still confined on a consecutive sentence.

Because the sentence correction here related to good-time credits, a description of the administration of these credits must precede further analysis. Good-time credit systems were adopted by statute, *see, e.g.*, Okla. Stat. tit. 57, § 138, in part to give prisoners an extra incentive to abide by prison policies, *see, e.g., State v. McCallion*, 875 P.2d 93, 94–95 (Alaska Ct. App. 1994); they were

---

[1](...continued)
the institution shall commence and be followed by those sentences which are subsequently received at the institution, in the order in which they are received by the institution, regardless of the order in which the judgments and sentences were rendered by the respective courts, unless a judgment and sentence provides that it is to run concurrently with another judgment and sentence.

-2-

no part of the common law.  The governing statutes authorize the Department of Corrections to promulgate regulations.  *See* Okla. Stat. tit. 57, §§ 138(B) (giving Department power to promulgate regulations governing class-level assignments), 507(b) (giving Director of Corrections general power "[t]o prescribe rules and regulations for the operation of the Department").

Section 138 does not provide for sentence audits to correct credit-calculation errors.  It does provide for an "adjustment review committee" that "[a]t least once every four . . . months . . . shall evaluate the class level status and performance of [each] inmate and determine whether or not the class level for the inmate should be changed."  *Id.* § 138(F).  "Any inmate who feels aggrieved by a decision made by an adjustment review committee may utilize normal grievance procedures in effect with the Department of Corrections and in effect at the facility in which the inmate is incarcerated."  *Id.*  But these provisions do not apply here because Mr. Warnick complains of a sentence adjustment to correct a calculation error, not a change in his class-level assignment.

The sentence-administration regulations neither clearly prohibit nor clearly permit an offset or audit for calculation errors after rebill; they are silent on the question.  On one hand, the regulations contemplate adjustments of credits attributable to a prior month**:**

> Any modifications of any type of credit for preceding months discovered through the audit process will be posted in the other

-3-

column of the month through which the audit is performed. If a modification results in taking of credit previously posted, the credit will be preceded by the symbol for negative credit (-).

DOC Manual OP-060211(VI)(C)(2)(d). And audits of time calculations are provided for by DOC Manual OP-060211(VIII). On the other hand, the May 2002 audit of Mr. Warnick's records did not take place in any of the "situations" in which "[a]udits will be performed"—for example, on reception, parole, or rebill. DOC Manual OP-060211(VIII)(A)(1). But a list of situations in which audits *will* be performed does not necessarily imply that those are the only situations in which an audit *may* be performed. For example, the Department's "[r]esolution/action" in response to a grievance "may include any appropriate remedy as authorized by Oklahoma law." DOC Manual OP-090124(VI)(C)(1). A sentence audit would seem to be an appropriate remedy for a grievance claiming a credit-calculation error, even though "in response to a grievance" is not one of the situations in which, according to the sentence-administration regulations, an audit "*will* be performed." DOC Manual OP-060211(VIII)(A)(1) (emphasis added).

The case law likewise does not offer definitive guidance. Language in an early case strongly suggests that adjustments to good-time credits are forbidden once the prisoner has completed a sentence. In 1920 the Oklahoma Criminal Court of Appeals wrote the following concerning a prisoner serving consecutive sentences: "[I]n this case . . . the prisoner had fully served the first three terms of

-4-

imprisonment for which he was sentenced, and the warden of the penitentiary [was] powerless to go back and deprive the prisoner of good time . . . under any of such sentences." *Ex parte Ray*, 193 P. 635, 639 (Okla. Crim. App. 1920).

But this statement in *Ray* is explicitly dictum. *See Ray*, 193 P. at 639. And the syllabus by the court in *Ray* limits the broader language in the opinion to circumstances distinguishable from this case. Rather than saying that good-time credits on a fully served sentence may *never* be adjusted, the syllabus states:

> [W]here a prisoner has fully served a sentence and has begun to serve a second or other subsequent sentence, the warden of the penitentiary is without power to go behind the sentence the prisoner is then serving and deprive the prisoner of good time . . . allowed when serving the previous sentence *for any infraction of the prison rules occurring subsequent to the completion of the previous term*."

*Id.* at 635–36 (emphasis added).

Moreover, cases decided after *Ray* suggest that the Oklahoma courts might permit the audit and offset in this case. In *Ex parte Edwards*, 204 P.2d 547 (Okla. Crim. App. 1949), the prisoner was first convicted of stealing "domestic fowl" and sentenced on that charge to two years' imprisonment in the state reformatory. While confined he was convicted of assault with intent to kill and sentenced to a further two years' imprisonment in the reformatory, to be served after the initial two-year sentence. *Id* at 547–48. After that, while still confined on the first sentence, he was convicted of murder and sentenced to 40 years' imprisonment. *Id.* at 548. He was moved to the penitentiary and booked in to

-5-

serve the 40-year sentence. *Id.* After that sentence had been fully served, the warden held him to serve the second two-year sentence, to be followed by the remainder of the first two-year sentence. *Id.* He petitioned for habeas corpus, contending that because sentences are to be served in the order received, the warden's booking him in on the 40-year sentence before he had finished serving the first two constituted a waiver of the remaining time on the first two sentences. *Id.* at 549.

The Oklahoma Criminal Court of Appeals put the question and answered it this way:

> By reason of the failure of the Clerk at the State Penitentiary to enter the sentences in their proper order, should petitioner be discharged prior to the time the sentences imposed upon him would be fully served? We think not. . . . [T]he proper procedure would be for the Warden of the Penitentiary to correct his records . . . . Petitioner would then be entitled to his discharge on May 12, 1950.

*Id.* at 550. Thus, the Oklahoma court held that time allotted to the 40-year sentence, which had been fully served, could, because of the warden's mistake, be reclassified as time on the two two-year sentences, with the consequence that Petitioner's release would be delayed.

In a later case with similar facts—sentences appearing in the wrong order in the prison records—the court explained that "[a]n incorrect entry by the warden [will] not authorize the release of [a] prisoner unless it [is] shown that he [has] fully satisfied the valid sentences which [have] been pronounced against him."

-6-

*Grimes*, 221 P.2d at 681. And in the context of crediting to another sentence time served on an invalidated sentence, the same court quoted at length a Fourth Circuit decision that said: "'We emphasize[] that all that [is] involved [is] an adjustment of the administrative records of the prison authorities.'" *Floyd v. State*, 540 P.2d 1195, 1197 (Okla. Crim. App. 1975), quoting *Miller v. Cox,* 443 F.2d 1019, 1021-22 (4th Cir. 1971).

As further guidance, one may look to state agencies' interpretations of state law. Under federal law when the agency that has promulgated the regulation in question has also interpreted it, courts may give that interpretation substantial deference. *See, e.g., Archuleta v. Wal-Mart Stores, Inc.,* 395 F.3d 1177, 1184-85 (10th Cir. 2005); *Gerber v. Hickman*, 291 F.3d 617, 626 (9th Cir. 2002) (en banc) (Tashima, J., dissenting) ("the Warden's interpretation of the [prison] regulation is entitled to deference"). Oklahoma law appears to be the same. *See Liberty Bank & Trust Co. v. Splane*, 959 P.2d 600, 602 (Okla. Civ. App. 1998) ("Our courts will show great deference to the interpretation given a statute or rule by the officers or agency charged with its administration, and will not disturb that construction except for very cogent reasons.").

Here, the Department of Corrections interpreted the audit regulations when it rejected Mr. Warnick's claim that his sentence could not be audited after it had been fully served. On August 9, 2000, after Mr. Warnick appealed the loss of 75

credits, the Department wrote: "The Department of Corrections auditor has the responsibility and the authority to correct errors related to the service of your sentence. You were clearly not entitled to the credit and it was appropriately removed from your record." R. doc. 1 ex. O. In a letter to Mr. Warnick five days later, the Department wrote: "The Department of Corrections has the responsibility and the authority to correct errors related to the service of sentences *while an inmate is in our custody*. You were clearly not entitled to the credit and it was appropriately removed from your record." R. doc. 1 ex. P (emphasis added).

Similarly, the Warden has consistently taken the position in this litigation that the audit and offset were legal. In *Auer v. Robbins*, 519 U.S. 452, 462 (1997), the Supreme Court deferred to an interpretation of the Secretary of Labor advanced in an amicus brief. The Court held that this "does not, in the circumstances of this case, make it unworthy of deference" because "[t]here is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Id.* The Court contrasted *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 212–13 (1988), in which the Secretary of Health and Human Service's interpretation advanced in litigation was rejected because its having been adopted there for the

first time and its being inconsistent with the Secretary's prior litigation positions revealed it to be "nothing more than an agency's convenient litigating position."

The district court will need to determine in the first instance what, if any, deference is owed these agency pronouncements. Of course, the district court may find it convenient and expeditious to certify this issue of state law to the Oklahoma Court of Criminal Appeals.

A final point is necessary to clarify the issue before the district court. The critical double-jeopardy question in cases like this is whether state law gave the prisoner a *legitimate expectation* of finality in his sentence before that sentence was adjusted. Even if state law permitted the audit and offset *when they took place*, it is possible that this state-law result was so unforeseeable that the correction violated a legitimate expectation of finality.

A similar question is presented when a state court changes the common law of crimes, and an adversely affected defendant argues that this denies him due process. In *Rogers v. Tennessee*, 532 U.S. 451 (2001), the Supreme Court considered such a case. Rogers had stabbed Bowdery, who died 15 months later. *Id.* at 454. At common law this could not be murder because of the "year-and-a-day rule": Bowdery did not die within a year and a day of Rogers's stabbing him. *Id.* at 453–54. The Tennessee Supreme Court nonetheless affirmed Rogers's conviction of murder by abolishing the rule. *Id.* 455–56. Relying on "core due

process concepts of notice, foreseeability, and, in particular, the right to fair warning," *id.* at 459, the United States Supreme Court held "that a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning . . . where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," *id.* at 462 (internal quotation marks omitted). That was not the case in *Rogers* because the year-and-a-day rule was "widely viewed as an outdated relic of the common law," *id.*, had been widely abandoned elsewhere, and appeared in Tennessee cases only in dicta (although the Tennessee Supreme Court had recognized it as a part of Tennessee's common law). *Id.* at 455, 462–67. *Cf. Stephens v. Thomas*, 19 F.3d 498, 500-01 (10th Cir. 1994) (no ex post facto violation in correctly applying statute that had been misconstrued by agency).