# IN THE SUPREME COURT OF TEXAS

══════════
No. 15-0642
══════════

DELIA PAGAYON, MICHELLE FULTON, ALFREDO G. PAGAYON,
MICHAEL G. PAGAYON, AND THE ESTATE OF ALFREDO M. PAGAYON,
PETITIONERS,

v.

EXXON MOBIL CORPORATION, RESPONDENT

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued December 6, 2016**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE BOYD filed an opinion concurring only in the judgment.

JUSTICE LEHRMANN did not participate in the decision.

Following personal disagreements and harsh words, one convenience store employee picked a fistfight with another employee and that employee's father on store premises. Tragically, the father later died, and his family sued the employer, alleging that its negligent supervision of its employees caused the decedent's death. Though one does not ordinarily have a duty to control others, we have held that employers sometimes have a duty to control their employees. We have never defined the

contours of any general duty, and we do not do so today. We conclude only that an employer in the circumstances presented here has no such duty. We reverse the judgment of the court of appeals[1] and render judgment for the employer.

**I**

Alfredo Pagayon, Jr. ("J.R."), 22, and Carlos Cabulang, 54, worked as cashiers at a Houston convenience store owned by Exxon Mobil Corporation ("Exxon"). Vong Vu and Jovita Leslie also worked there, and Roce Asfaw managed the store. J.R.'s father ("Alfredo"), 58, worked as a toll booth attendant for the Harris County Toll Road Authority but had once worked for Exxon. He and Roce were friends, and it was at his request that Roce had hired J.R. Carlos had also worked for the Authority, and he and Alfredo knew each other. J.R. did not have a car, so Alfredo drove him back and forth to work. When he did, Alfredo would usually go into the store, and he and Carlos would chat. It cannot be said that they were friends, but there certainly was no hostility between them.[2]

Generally, J.R. thought the store had a family atmosphere and everyone got along very well. But Carlos had once asked him if he was having a sexual affair with Vong, who had given him a ride home, and though the exchange was "lighthearted"—J.R.'s word—J.R. felt like Carlos was harassing him. J.R. complained to Roce, who told him to just ignore Carlos. Roce never discussed the matter with Carlos.

---

[1] 467 S.W.3d 36 (Tex. App.—Houston [14th Dist.] 2015).

[2] We, of course, review the record in the light most favorable to the jury's verdict. *Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009). Almost all of our summary of the facts is taken from J.R.'s testimony.

One Thursday night while J.R. was working by himself, two customers complained that the men's restroom door had an "out of order" sign on it. Carlos had worked the prior shift, and he and a co-worker, Mark, had left as J.R. arrived. Neither had said anything to J.R. about the restroom being out of order, and when J.R. checked, he found it was not. Concerned that the customers would complain to his manager, J.R. felt Carlos was harassing him again, and though he did not know who put the sign on the door, whether Carlos or Mark, or whether it was simply a mistake, he later complained to Roce. Roce again told J.R. to just stay away from Carlos and ignore him. She did not discuss the matter with Carlos. Carlos did not know J.R. was angry and thus never harassed or threatened to retaliate against J.R. for complaining to Roce.

Early Friday morning, on the way home, J.R. was still upset and complained to his father about Carlos. When they arrived, Alfredo called Carlos on his cell phone and told him to stop harassing J.R. The two had a heated conversation, but after it was over, J.R. thought that everything was worked out and Carlos would leave him alone.

The following Monday morning, Alfredo took J.R. to work and went into the store to talk with Roce. Neither Alfredo nor J.R. told Roce about Alfredo and Carlos's phone call three days earlier or suggested to her that there was any reason to fear violence from Carlos. Roce left the store mid-afternoon, 12 minutes before Carlos arrived for his shift.

J.R.'s and Carlos's shifts were scheduled to overlap by 30 minutes. When Carlos entered the store at 3:34 p.m.,[3] he immediately began screaming, cursing, and threatening J.R. and Alfredo (who

---

[3] Security surveillance cameras recorded time-stamped photos of the events every two seconds.

was not yet there) repeatedly. J.R. was scared and told Jovita, who had not heard any of it. Jovita told Carlos to stop, but he refused, and J.R. asked Jovita to call Roce, which she did. Jovita told Roce that Carlos was threatening to beat J.R. up and asking him to go outside and fight. After she and Roce talked, Jovita told J.R. to stay away from Carlos. Roce did not speak with J.R. or Carlos herself or tell Jovita to have either or both of them leave the store since she knew J.R.'s shift was over at 4:00 p.m. J.R. did not call other higher-up managers or ask Jovita to do so.

Things calmed down, and J.R. continued working past the end of his shift, side by side with Carlos, until 4:36 p.m., then waited around a few more minutes for his father to pick him up. When Alfredo entered the store at 4:48 p.m., Carlos immediately left his cash register, where two customers were waiting, and walked over to Alfredo, cursing him. Face to face, Carlos shoved Alfredo, and Alfredo shoved back. Carlos then punched Alfredo, and the two began to fight. Carlos also punched J.R., who entered the fray, punching Carlos several times. After Carlos knocked Alfredo down, J.R. put Carlos in a headlock and pushed him to the floor. When Carlos begged J.R. not to hit him again, J.R. desisted. The fight was over in a few seconds, less than a minute after Alfredo entered the store.

Alfredo was complaining that he could not breathe, so J.R. called 9-1-1. Paramedics carried Alfredo from the store on a stretcher and took him immediately to a hospital, where his chest was x-rayed. The emergency room physician, Dr. Hung Hoang Dang, misread a dark space on the x-ray as an indication that Alfredo's left lung had filled with fluid and tried several times to insert a chest tube to drain it. In fact, Alfredo had been born without a left lung, which accounted for the dark space on the x-ray. From then on, Alfredo's condition deteriorated, and he died 23 days later from

4

cardiac arrhythmia, respiratory failure, and renal failure. Sepsis, possibly resulting from the failed attempts to drain Alfredo's lung, most likely caused the organ failure.

J.R. and his mother, brother, and sister ("the Pagayons") sued Exxon for wrongful death and, on behalf of Alfredo's estate, for survival damages. Exxon moved to designate Dang as a responsible third party, arguing that his negligent care was the true cause of Alfredo's death.[4] The trial court refused to allow the designation, concluding that as an emergency physician, Dang could not be liable for simple negligence but only for wilful and wanton negligence,[5] of which Exxon had produced no evidence. The trial court also refused to allow Exxon to put on evidence at trial about Alfredo's hospital care.

The Pagayons asserted both that Exxon was responsible for Carlos's actions and that it was itself negligent in supervising Carlos and failing to take steps to prevent the fight from occurring. Roce testified that harassment and threats of violence should never be tolerated in the workplace; that a manager, alerted to a threat of violence, should do something about it; and that she believed she could have prevented the fight just by speaking to Carlos. She could also have sent J.R. home

---

[4] *See* TEX. CIV. PRAC. & REM. CODE § 33.011(6) ("'Responsible third party' means any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these.").

[5] *See id*. § 74.153 ("In a suit involving a health care liability claim against a physician or health care provider for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, the claimant bringing the suit may prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with wilful and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.").

when Jovita called, as his shift had ended, or she could have sent Carlos home. But she explained that the harassment J.R. had complained of twice before had not been physical, and she thought nothing more was required. Carlos had no history of violent conduct, and Exxon's background check before hiring him revealed no criminal record.

The jury failed to find that Carlos was acting in the scope of his employment during the fight, thus precluding Exxon from being vicariously liable. But the jury found that Exxon's negligent supervision of its employees, together with J.R.'s and Alfredo's negligence, caused Alfredo's death. The jury apportioned responsibility 75% to Exxon, 15% to J.R., and 10% to Alfredo. The Pagayons did not sue Carlos, Exxon did not move to name him as a responsible third party, and the jury was not asked to apportion responsibility to him. The jury awarded the Pagayons nearly $2 million in damages. The trial court rendered judgment on the verdict.

Exxon appealed. It argued that it could not be liable because it had no duty to control Carlos, or if it did, there was no evidence it breached the duty—that is, no evidence that it negligently supervised Carlos—or that any negligent supervision caused Alfredo's death.[6] Exxon also argued that the trial court erred in refusing to allow Dang to be designated as a responsible third party.[7] The court of appeals rejected Exxon's no-liability arguments.[8] But on the designation issue, the court stated that a hospital emergency room physician is held to the same standard of care as any other physician, and responsibility for injury should be apportioned to him as to any other wrongdoer,

[6] 467 S.W.3d 36, 41 (Tex. App.—Houston [14th Dist.] 2015).

[7] *Id*.

[8] *Id*. at 44–48.

6

although a claimant must prove wilful or wanton negligence to recover damages.[9] The panel split on whether Exxon had produced evidence that Dang was negligent, a majority holding that it had.[10] The court thus concluded that Exxon was entitled to designate Dang a responsible third party and include him in the jury's apportionment of responsibility for Alfredo's death. Accordingly, the court remanded the case for a new trial.[11]

We granted the Pagayons' and Exxon's petitions for review.[12] The Pagayons argue that the trial court's judgment should have been affirmed. Exxon argues that it is entitled to rendition of judgment in its favor. We agree with Exxon and thus do not reach the Pagayons' arguments regarding the designation of Dang as a responsible third party.

**II**

We have been quite clear: "The threshold inquiry in a negligence case is duty. . . . [T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question."[13] When a duty has not been recognized in particular circumstances, the question is whether one should be. In *Humble Sand & Gravel, Inc. v. Gomez*,[14] we explained how the existence of a duty is to be determined:

---

[9] *Id*. at 49–50.

[10] *Id*. at 51–53.

[11] *Id*. at 57.

[12] 59 Tex. Sup. Ct. J. 1593–1594 (Sept. 2, 2016).

[13] *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990), citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 312 (Tex. 1983).

[14] 146 S.W.3d 170 (Tex. 2004).

The considerations include social, economic, and political questions and their application to the facts at hand. We have weighed the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. Also among the considerations are whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm.[15]

We recognized that some of these factors—risk and foreseeability are obvious examples—"may turn on facts that cannot be determined as a matter of law and must instead be resolved by the factfinder", but we noted that such cases are unusual.[16] One reason is that the factual situation presented must be evaluated in the broader context of similarly situated actors. The question is whether a duty should be imposed in a defined class of cases, not whether the facts of the case at hand show a breach. Another reason is that the material facts are either undisputed or can be viewed in the light required by the procedural posture of the case. In the present case, the facts material to the duty inquiry—the events leading up to Alfredo's injury—are essentially undisputed, and we view them in light of the verdict. The policy components of the factors—including the nature of the covered risks and general foreseeability—are policy issues for the court to consider as a matter of law. The factors determine how the class of cases in which the duty applies is to be defined and how that definition shapes the contours of the duty.

---

[15] *Id*. at 182.

[16] *Id*.

No general duty to control others exists, but a special relationship may sometimes give rise to a duty to aid or protect others.[17] Employment is such a relationship.[18] We have acknowledged limited instances where an employer has a duty to control its employee and is directly liable when it fails to do so. For example, a night club that requires exotic dancers to consume alcohol with customers to the point of intoxication has a duty to take reasonable care to prevent them from driving home after work.[19] More broadly, an employer that exercises control over an employee because he has become intoxicated at work, even on the sly, without his employer's permission, has a duty to exercise reasonable care to ensure that he is not a risk to himself or others driving home.[20]

In contrast to these narrow exceptions to the general rule, Section 317 of the *Restatement (Second) of Torts* describes a broad duty:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant

---

[17] *See, e.g.*, *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404–405 (Tex. 2009); *Trammell Crow Cent. Tex. Ltd. v. Gutierrez*, 267 S.W.3d 9, 12 (Tex. 2008); *Providence Health Ctr. v. Dowell*, 262 S.W.3d 324 (Tex. 2008); *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006); *Greater Houston Transp. Co.*, 801 S.W.2d at 525; *Otis Eng'g Corp.*, 668 S.W.2d at 309 ("As a general rule, one person is under no duty to control the conduct of another, even if he has the practical ability to exercise such control." (internal citation omitted)). *See also* RESTATEMENT (SECOND) OF TORTS § 314 (1965) ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."); W. PAGE KEETON, PROSSER AND KEETON ON TORTS § 56 (5th ed. 1984).

[18] *See*, *e.g.*, *Nabors*, 288 S.W.3d at 405; *Loram*, 210 S.W.3d at 596.

[19] *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 452 (Tex. 2002).

[20] *Otis Eng'g Corp.*, 668 S.W.2d at 311.

> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>
> (ii) is using a chattel of the master, and
>
> (b) the master
>
> > (i) knows or has reason to know that he has the ability to control his servant, and
> >
> > (ii) knows or should know of the necessity and opportunity for exercising such control.

We have never recognized this duty in Texas, contrary to the court of appeals' statement that we have "adopted" Section 317.[21] The court over-read our cases. We have cited the section four times. The first was in a 1971 case, *Kelsey-Seybold Clinic v. Maclay*.[22] There, a physician persuaded his patient to leave her husband, and the husband sued the physician and the Clinic that employed him for alienation of affection.[23] We observed that the Clinic should owe some duty to its patients to protect them from injury on its premises, and citing Section 317, some duty to prevent an employee from improperly using his position to tortiously interfere with family relations.[24] But, we concluded, the "meager" summary judgment did "not necessarily indicate that the Clinic was under a duty to act or that it could have done anything", even though it also did not "affirmatively and clearly appear

---

[21] 467 S.W.3d 36, 43 (Tex. App.—Houston [14th Dist.] 2015).

[22] 466 S.W.2d 716, 720 (Tex. 1971), *superseded by statute on other grounds as stated in Helena Labs. Corp. v. Snyder*, 886 S.W.2d 767, 768 (Tex. 1994) (per curiam).

[23] *Kelsey-Seybold Clinic*, 466 S.W.2d at 717.

[24] *Id*. at 719–720.

that the Clinic could or should have done nothing."[25] Ultimately, we held that the Clinic was not

entitled to summary judgment,[26] and our reasoning regarding possible liability was dicta. Our other

three references to Section 317 were merely citations.[27] We have never endorsed nor applied Section

317.

Most recently, in *Waffle House, Inc. v. Williams*, we stated: "We have not ruled definitively

on the existence, elements, and scope of [torts such as negligent retention and supervision of an

employee by an employer] and related torts such as negligent training and hiring."[28] Granted, the

courts of appeals have often held employers to very general duties,[29] but they have not weighed the

factors that determine whether a duty exists, and what it is. They have not analyzed the risk,

foreseeability, and likelihood of injury in requiring employers to control employees, versus the

burdens on and consequences to employers, and the social utility and realities of the workplace.

These, it must be emphasized, are matters of law to be weighed and determined by the court before

a duty is applied. It is not enough simply to require employers, or others, to exercise ordinary care

---

[25] *Id*. at 720.

[26] *Id*.

[27] *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983) (including this section among other *Restatement* provisions imposing certain duties); *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 n.3 (Tex. 2006); *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404–405 (Tex. 2009).

[28] 313 S.W.3d 796, 804 n.27 (Tex. 2010).

[29] *See, e.g.*, *Davis-Lynch, Inc. v. Asgard Techs., LLC*, 472 S.W.3d 50, 63 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 287 (Tex. App.—Dallas 2015, no pet.); *Ramirez v. Colonial Freight Warehouse Co.*, 434 S.W.3d 244, 253–254 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 495–496 (Tex. App.—Fort Worth 2002, no pet.); *Garcia v. Allen*, 28 S.W.3d 587, 592 (Tex. App.—Corpus Christi 2000, pet. denied); *Houser v. Smith*, 968 S.W.2d 542, 544 (Tex. App.—Austin 1998, no pet.); *Mackey v. U.P. Enters., Inc.*, 935 S.W.2d 446, 459 (Tex. App.—Tyler 1996, no writ).

in all circumstances. Texas law requires the court to be more specific, to balance the relevant factors in determining the existence, scope, and elements of legal duties.

Section 317 is not a product of this balance. Under Section 317, an employer's duty to control an employee acting outside the scope of employment to prevent harm to others has three elements. The first is that the employee's conduct occur on or with the employer's property. This limitation is not necessitated by the basis of liability, employer control. It confines duty as a matter of policy. The second element, that the employer knows or should know it can control the employee, adds almost nothing. An employer certainly should not be liable for an employee it cannot control, and any employer would almost always know whether it can or cannot. The third element of the duty described in Section 317 is that the employer "knows or should know of the necessity and opportunity for exercising such control." This element is necessary for the existence of a duty. Certainly, an employer should have no duty to control an employee when it neither knows nor should know of the need and opportunity to do so. But the third element of Section 317 is not sufficient for the existence of a duty. Whether a duty to control employees should be imposed when employers know or should know of the necessity and opportunity for exercising control can be determined only after weighing the burden on the employer, the consequences of liability, and the social utility of shifting responsibility to employers. These factors do not support the broad duty of reasonable care in all situations that Section 317 would impose.

This is a case in point. J.R.'s two complaints of harassment by Carlos prior to the fateful Monday afternoon cannot even arguably have given Exxon reason to think employee friction might injure store patrons. Carlos's lighthearted question to J.R. about his relationship with Vong was not

12

harassment in any real sense of the word, and J.R. never knew whether Carlos had anything to do with putting the "out of order" sign on the door. J.R.'s complaints in each instance do not evidence a history of Carlos's harassment; rather, they show that J.R. was not always to be taken seriously. Carlos's harassment of J.R. began one afternoon at 3:34 p.m. as a result of a phone conversation he'd had with Alfredo more than three days earlier, and ended one hour and fourteen minutes later in a fistfight in which Alfredo and J.R. participated. The first Roce knew there was a problem was minutes before J.R.'s shift ended at 4:00 p.m., when he should have left the store. The likelihood that a personal grudge over a phone call would lead to a fistfight and death was surely slight. The temptation to view the situation in hindsight is too great. Perhaps, as Roce believed, she could have prevented the fight by talking to Carlos herself, but the fight would also not have occurred had Alfredo stayed away from Carlos after their phone conversation. If Section 317 correctly stated an employer's duty in these circumstances, one might argue that Roce knew or should have known of the need to control J.R. and Carlos, and that her failure to do so was a failure to exercise reasonable care. But Section 317 does not correctly state an employer's duty. To require every employer to intervene in all such circumstances and hold it liable for any result, however unlikely, would impose too great a burden on the employment relationship.

The *Restatement (Second) of Torts* takes a "no, but" approach to the duty for failing to control others: the general rule is no liability, but there are exceptions, like Section 317. The *Restatement (Third) of Torts: Physical and Emotional Harm* takes a "yes, but" approach. Section 41(a) provides that "[a]n actor in a special relationship with another owes a duty of reasonable care to third parties

13

with regard to risks posed by the other that arise within the scope of the relationship."[30] One such relationship is that of "an employer with employees when the employment facilitates the employee's causing harm to third parties".[31] Thus, Section 41(a) describes a duty that is more general than the duty under Section 317, and perhaps broader. But comment b adds this caveat: "Even though an affirmative duty might exist pursuant to this Section, a court may decide, based on special problems of principle or policy, that no duty or a duty other than reasonable care exists."[32] Among those principles and policies are the factors that must be weighed under Texas law in defining legal duties.

What duty should be imposed on employers to prevent employees from harming third persons is difficult to state generally. When we have recognized a duty before, we have narrowly described the situations affected: an employee required to consume alcohol as part of her job, or allowed to consume alcohol on the job. The correct balance of the factors that must be considered in creating duties is very hard to strike for all such situations because of the myriad circumstances that can arise. We have not attempted this effort in the past, and we need not do so here. Nor do we need to create another exception to the general rule that one does not have a duty to control others. Whatever duty an employer may have to control its employees, the factors that must shape it cannot extend it to the situation here.

*The risk of an occurrence such as this is small.* We are not presented with a situation in which repeated, serious threats or actions could well pose a threat to patrons. Rather, the issue is

---

[30] RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 41(a) (2012).

[31] *Id.* § 41(b)(3).

[32] *Id.* § 41 cmt. b.

14

whether an employer should be required to respond to employee discord by monitoring them constantly and reacting to every complaint, however slight. Whatever duty an employer may have, it cannot extend to minor situations.

*The foreseeability of injury is small, and the likelihood of injury is remote.* The disagreements among Carlos, J.R., and Alfredo had been matters of words until the fistfight suddenly broke out. While it may have been foreseeable that those disagreements would linger or even fester, nothing suggests that they were likely to lead to serious injury. Any duty an employer has to control its employers should not make it an absolute insurer of their safety and the safety of patrons.

*The burden on the employer, while not heavy, is significant.* In hindsight, at least, better supervision of store employees might have prevented the fight, as Roce herself admitted. But to discharge a duty to prevent an occurrence such as this, an employer would be required to investigate almost every employee complaint and monitor every situation. This would significantly burden the employment relationship.

*The consequences can be extreme.* While we assume the fistfight led to Alfredo's death, that result was bizarre, given the brevity of the altercation, the absence of any weapons, and the slightness of the provocation. To extend liability to an employer in such a situation would render the employer liable for the most extreme consequences of simple employee friction.

*The social utility is small.* While Exxon might have been able to prevent Carlos, J.R., and Alfredo from injuring each other, the public was never in danger. Any social utility to requiring an employer to be as vigilant as Exxon would have to have been to prevent a fistfight involving employees is minimal.

Applying the factors that determine duty, we conclude that an employer in a situation like the one presented here owes no duty to supervise its employees.[33] As a matter of law, Exxon was not liable to the Pagayons.

*　　*　　*　　*　　*

Accordingly, we reverse the judgment of the court of appeals and render judgment for Exxon.

*So ordered.*

Nathan L. Hecht
Chief Justice

Opinion delivered: June 23, 2017

---

[33] The concurring opinion criticizes this as both a "Potter Stewart-esque we-know-duty-when-we-see-it approach" and a "Solomon-like solution[]." *Post* at ___. We confess to the latter charge but reject the former. Judicial recognition and application of legal duties must be an objective exercise—not subjective, differing widely from one judge to another. Stating duty in terms of particular, objective standards serves that end, assuring more consistent results and providing surer guidance for complying with the law. That was the point of the two dissents the concurring opinion cites —stating a duty too broadly and indefinitely leads to judicially subjective applications. *See State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 50 (Tex. 1998) (Hecht, J., dissenting) (arguing that "deficient investigation" is not an adequate standard for the tort of insurance bad faith); *Twyman v. Twyman*, 855 S.W.2d 619, 629 (Tex. 1993) (Hecht, J., dissenting) (arguing that "outrageousness" is an insufficiently objective and particular standard for imposing damages for intentional infliction of emotional distress). That is our point here. Rule 317 rests liability almost entirely on what an employer knows or should know of the necessity and opportunity for controlling its employees without differentiating, even categorically, among the myriad circumstances that can arise or weighing the burdens and utility of imposing such liability, considering that as a general rule, one has no duty to control another. Significant liability—in this case, more than $2 million—depends on how broadly or narrowly a very general rule is judicially applied. The recognition of an appropriate rule must await "the incremental and reasoned development of precedent that is the foundation of the common law system." *Rogers v. Tennessee,* 532 U.S. 451, 461 (2001). Fundamentally, the concurring opinion prefers a prescriptive approach in recognizing legal duties to that of the common law.